IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MARYLAND

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Case No. 18-cv-1700-JKB |
| LAWRENCE HOGAN | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT'S REPLY IN SUPPORT OF
MOTION TO DISMISS COMPLAINT**

**I.   MARYLAND'S BAN ON DANGEROUS RAPID FIRE TRIGGER ACTIVATORS IS A PROPER EXERCISE OF THE STATE'S POLICE POWER AND DOES NOT CONSTITUTE A TAKING.**

As set forth in the defendant's opening memorandum (ECF 9-1), what is at stake in this litigation is the State's ability to exercise its police power to ban the possession of dangerous devices that threaten public safety. After the nation's deadliest mass shooting in Las Vegas in October 2017, the General Assembly exercised its legislative police power to ban the possession, sale, and transfer of rapid fire trigger activators, such as the bump stocks used in the Las Vegas shooting and other devices that similarly are constructed to allow a firearm to mimic automatic fire. *See* 2018 Md. Laws, ch. 252 (the "Law") (ECF 9-4). The Las Vegas shooting "highlighted the destructive capacity of firearms equipped with bump-stock-type devices and the carnage they can inflict" and "made their potential to threaten public safety obvious," Bump-Stock-Type Devices, 83 Fed. Reg. 13,442, 13,447 (Mar. 29, 2018), https://www.gpo.gov/fdsys/pkg/FR-2018-03-29/pdf/2018-

1

06292.pdf.[1]  Notably, the plaintiffs do not allege that these devices are protected by the Second Amendment or even are useful for in-home self-defense.  Rather, the plaintiffs contend that the Law constitutes a taking because the plaintiffs purchased these dangerous devices before Maryland enacted the ban on possession.  This is wrong for the following reasons.

The State's ban on these dangerous devices does not constitute an unconstitutional taking.  Rather, it is a permissible exercise of the State's police power to further the State's compelling public interest in promoting public safety and reducing the negative effects of firearms violence.  *See Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir.) (en banc), cert. denied, 138 S. Ct. 469 (2017) ("Maryland's interest in the protection of its citizenry and the public safety is not only substantial, but compelling."); *see also Roberts v. Bondi*, No. 18-cv-1062-T-33TGW, 2018 WL 3997979, at *3-4 (M.D. Fla. Aug. 21, 2018) (dismissing takings challenge to Florida's ban on bump stocks because the ban "'prohibits the possession of contraband'" and, thus, is a proper "exercise of the legislative police power" (quoting state's brief)).

Arguing to the contrary, the plaintiffs misinterpret and misapply the holdings of the governing Supreme Court cases.  First, the plaintiffs misplace reliance on *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015), in which the Supreme Court held that the government's "physical *appropriation* of property," in that case raisins, constituted a compensable taking.  *Id.* at 2427 (emphasis in original).  Here, in contrast, because the

---

[1] "The contents of the Federal Register shall be judicially noticed . . . ." 44 U.S.C. § 1507.

State has not physically *appropriated* the plaintiffs' property, *Horne* is inapplicable. The plaintiffs erroneously contend, however, that the Law "takes away plaintiffs' personal property . . . by depriving plaintiffs of physical possession of their property[.]" (ECF 23, Pls.' Opp'n at 8.)  But in *Horne*, the Court was careful to highlight "the 'longstanding distinction' between government acquisitions of property and regulations" in its takings cases, *id.* at 2427, and acknowledged that even where a "physical taking" and "a regulatory limit . . . may have the same economic impact," the distinction lies in "the means [the government] uses to achieve its ends . . . ," *id.* at 2428.  Here, because the plaintiffs' personal property has not been "actually occupied or taken away," *id.* at 2427, the plaintiffs' reliance on *Horne* is misplaced.

Second, the plaintiffs misconstrue the scope of the Law and misinterpret the Supreme Court's decision in *Lucas v. South Carolina Coastal Council*, 595 U.S. 1003 (1992) to argue that the State's ban on the possession of rapid fire trigger activators constitutes "a complete regulatory deprivation of personal property." (ECF 23, Pls.' Opp'n at 9.)  In *Lucas*, the Court considered a state regulation that "wholly eliminated the value of the claimant's land." *Id.* at 1026.  Unlike the land regulation at issue in *Lucas*, the State's ban on the possession of rapid fire trigger activators does not render the devices devoid of economic value, because the plaintiffs can continue to possess, use, and sell the devices out of state.[2]  Moreover, in *Lucas*, the Court was careful to distinguish regulations on the

---

[2] The plaintiffs misplace reliance on *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011), in which the Seventh Circuit held that the district court improperly found no likelihood of irreparable harm from ordinances that operated to outlaw gun ranges because individuals could travel outside the city limits to exercise their Second

3

use of real property from those that impact the use of personal property, explaining that "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless[.]"  *Id.* at 1027-28; *see also Andrus v. Allard*, 444 U.S. 51, 65 (1979) ("[G]overnment regulation—by definition—involves the adjustment of rights for the public good.  Often this adjustment curtails some potential for the use or economic exploitation of private property.  To require compensation in all such circumstances would effectively compel the government to regulate by *purchase*." (emphasis in original)).  Here, akin to the regulation of commercial dealings for the public good, the State has banned the possession of inherently dangerous devices to further the State's interest in public safety.  Thus, employing a "case-specific inquiry into the public interest advanced in support of the restraint," *Lucas*, 505 U.S. at 1015, the State's interest in protecting the public from the dangers associated with the use of rapid fire trigger activators justifies the regulatory action at issue and "do[es] not require compensation," *id.* at 1026; *see also Roberts*, 2018 WL 3997979, at *3-4.

The plaintiffs also misread *Andrus v. Allard*, in arguing that because the State has prevented them from possessing their rapid fire trigger activators in Maryland, the State has effected a taking. On the contrary, the Court in *Andrus* explained that "where an owner possess a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is

---

Amendment rights, which they alleged included the right to maintain proficiency in firearm use at a gun range.  Here, the plaintiffs have not alleged that the Law violates their Second Amendment rights.

not a taking, because the aggregate must be viewed in its entirety." 444 U.S. at 65-66. Thus, in that case, although the commercial ban on the sale of protected bird artifacts "prevent[ed] the most profitable use of the [challengers'] property," the government had not effected a taking because the challengers still retained the less valuable rights to possess and transport the goods. *Id.* at 66. Here, like the plaintiffs in *Andrus*, the plaintiffs retain property rights in the personal property that is the subject of the regulation, even though they can no longer possess them in Maryland. In *Andrus*, the government was not compelled "to regulate by purchase," *id.* at 65 (emphasis omitted), where it sought to protect endangered species by severely curtailing the challengers' property rights in their protected bird artifacts. Certainly, then, the State also need not regulate by purchase in order to exercise its police power to ban possession of inherently dangerous devices that pose grave risks to public safety.

Finally, the plaintiffs misinterpret *Mugler v. Kansas*, 123 U.S. 623 (1887), in which the Supreme Court rejected a takings claim where the challengers had purchased or erected their breweries before a state law prohibiting the manufacture and sale of alcoholic beverages was enacted. The Court ruled that a "prohibition simply on the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any sense, be deemed a taking or an appropriation of property for the public benefit." *Id.* at 668-69; *see also Samuels v. McCurdy*, 267 U.S. 188, 198 (1925) (applying rule in *Mugler* and holding no compensation due for liquor rendered valueless where prohibition fell "within the police power of the states"). The plaintiffs attempt to distinguish *Mugler* on the ground that the challenged law "did not involve a

seizure of the brewery itself" (ECF 23, Pls.' Opp'n at 11), but, of course, Maryland has not seized rapid fire trigger activators from the plaintiffs or required that they be forfeited to the State. Like the ban on the sale and manufacture of beer at issue in *Mugler*, the State's ban on the possession of rapid fire trigger activators, enacted to protect the public from inherently dangerous devices, is not a compensable taking.

Moreover, here, as in *Mugler*, "the State did not . . . give any assurance, or come under an obligation, that its legislation upon [the] subject [of the regulation] would remain unchanged." 123 U.S. at 669. As described above, the State has exercised its police power to ban devices that function to modify a firearm to mimic a type of weapon "the ownership of which would have the same quasi-suspect character [the Supreme Court has] attributed to owning hand grenades," *Staples v. United States*, 511 U.S. 600, 611-12 (1994). *See Holliday Amusement Co. of Charleston v. South Carolina*, 493 F.3d 404, 411 (4th Cir. 2007) (rejecting in takings challenge the contention that the plaintiff had "a legitimate expectation of [video gaming's] continued legality," particularly "in the case of a heavily regulated and highly contentious activity . . . [in which] the pendulum of politics swings periodically between restriction and permission"); *Akins v. United States*, 82 Fed. Cl. 619, 624 (Fed. Cl. 2008) (manufacturer of device "that increased the rate at which semi-automatic weapons are discharged" had no property interest that derived from his expectation that he could continue to manufacture the item free from government regulation). Machine guns have long been subject to heavy government regulation, and the federal government has in the past determined that devices that modify firearms to achieve rapid fire constitute machine guns. *See Akins*, 82 Fed. Cl. 619. In their

6

declarations, the plaintiffs have all acknowledged that they purchased their rapid fire trigger activators in the years *after* the Bureau of Alcohol, Tobacco, Firearms, and Explosives changed its interpretation of whether the device at issue in *Akins* constituted a machine gun under federal law.  (*See* ECF 23-1, 23-2, 23-3, 23-4.)  Thus, they cannot plausibly claim that they had legitimate expectations in the continued legality of the similar devices they purchased that fall within the same heavily-regulated area.[3]

As the Supreme Court stated in *Mugler*, "the supervision of the public health . . . is a governmental power, continuing in its nature, and to be dealt with as the special exigencies of the moment may require."  123 U.S. at 669 (internal citation and quotation marks omitted).  Here, in the wake of the nation's deadliest mass shooting, Maryland exercised its police power to ban devices like those used in the Las Vegas shooting that enabled the shooter to fire off hundreds of rounds in mere minutes and that pose significant public safety risks.  Given the nation's long history of regulating machine guns and the undisputed character of the banned devices as modifying firearms to allow them to mimic

---

[3] Nor can the plaintiffs assert any investment-backed expectation in continuing to possess these devices, given that they function to allow semi-automatic firearms to mimic heavily-regulated machine guns and were relatively inexpensive to purchase and legal to possess because of a loophole in federal and State regulatory regimes.  *See* 83 Fed. Reg. at 13,444 (the ATF recognizing that "the inventor and manufacturer of the bump-stock-type devices used in the Las Vegas shooting has attributed his innovation of those products specifically to the high cost of fully automatic firearms"); ECF 20, Br. of *Amicus Curiae* Giffords Center to Prevent Gun Violence in Support of Defendant and Dismissal at 8-15; *see also Holliday*, 493 F.3d at 411 n.2 (under a partial-takings analysis, plaintiff's "participation in a traditionally regulated industry greatly diminishes the weight of his alleged investment-backed expectations).

7

the rate of fire of automatic weapons, the State's exercise of its police power does not constitute a taking.[4]

## II. MARYLAND'S BAN ON DANGEROUS RAPID FIRE TRIGGER ACTIVATORS IS NOT A RETROACTIVE ABROGATION OF VESTED RIGHTS.

The considerations discussed above also compel dismissal of the plaintiffs' claims that the State's ban on rapid fire trigger activators is a violation of the Maryland Constitution. As discussed in the defendant's opening memorandum, "it is a fundamental principle" of State law that "'persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State.'" *Syska v. Montgomery County Bd. of Educ.*, 45 Md. App. 626, 633 (1980) (quoting *Jacobson*

---

[4] For these same reasons, the plaintiffs heavy reliance on *Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017), *aff'd,* No. 17-56081, 2018 WL 3433828 (9th Cir. July 17, 2018), is misplaced. In *Duncan*, the district court preliminarily enjoined California's ban on the possession of magazines holding more than 10 rounds of ammunition. The district court's finding that the plaintiffs were likely to succeed on their takings claim, however, stemmed from the court's decision that large-capacity magazines were protected under the Second Amendment and were not, as the state had deemed, "a nuisance." *Id.* at 1137 (noting the Supreme Court's observation that "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials'" (quoting *Staples*, 511 U.S. at 610 (alteration in *Duncan*)). The district court went on to conclude that "[a]s the law-abiding owner relinquishes his magazine, he or she may also forfeit the self-defense peace of mind that a large capacity magazine had instilled. As in other cases where constitutional rights are likely chilled, the balance of hardships weighs in the citizen's favor." *Duncan*, 265 F. Supp. 3d at 1138. These Second Amendment interests are not implicated here. The plaintiffs have not alleged that the State's ban on rapid fire trigger activators chills their Second Amendment rights, or even that the banned devices are useful for in-home self-defense. Moreover, as the Ninth Circuit panel's dissenting judge persuasively explained, because the current owners of the magazines could transport them out of state and retain ownership of them, the state had not effected a physical appropriation of the magazines, and the record lacked any evidence that the overall economic impact of the ban constituted a regulatory taking. *Duncan v. Becerra*, No. 17-56081, 2018 WL 3433828, at *5 (9th Cir. July 17, 2018) (Wallace, J., dissenting).

8

*v. Massachusetts*, 197 U.S. 11, 25 (1905)). Cases the plaintiffs cite in which the State divested owners of all benefits in their property rights and transferred those rights to another defined group are, thus, inapposite, because they do not involve the State's exercise of its police power to ban possession of inherently dangerous devices that pose significant risks to public safety.

Further, in *Muskin v. State Department of Assessments & Taxation*, 422 Md. 544 (2011) and *Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604 (2002), the statutes at issue were found to act retroactively to abrogate vested rights because the property owners in those cases reasonably relied on their settled expectations in continuing to benefit from past transactions, *Muskin*, 422 Md. at 558, and had "a firm expectation for the future enjoyment" of the benefits conferred from owning the property, *id.* at 560. Here, in contrast, for the reasons described above, the plaintiffs had no reasonable expectation in the continued possession of inherently dangerous devices in Maryland that were designed to take advantage of a loophole in the laws banning machine guns.

Even where the State has completely deprived an individual of his or her property to further the State's interest in public safety, the Maryland appellate courts have found no constitutional violation. For example, in *Raynor v. Maryland Department of Health and Mental Hygiene*, 110 Md. App. 165 (1996), the Court of Special Appeals of Maryland held that the State's destruction of the plaintiff's pet ferret for public safety purposes was not a compensable taking where a public nuisance was abated, and there was no settled expectation to keep a wild animal free of government regulation that may result in its destruction. *Id.* at 188-93.

Further, in *Serio v. Baltimore County*, 384 Md. 373 (2004), although the Court of Appeals of Maryland held that an owner of firearms who was ineligible to lawfully possess them retained a property interest in those firearms, the Court did not remotely suggest that the ban on *possession* violated the State Constitution.  Rather, the Court found that "[w]hen property has been physically appropriated by a governmental entity from a property owner, the government must 'justly' compensate the property owner," *Serio*, 384 Md. at 399, which in that case "may be realized through a court ordered sale of the firearms[,]" *id.* Here, not only has the State not physically appropriated the plaintiffs' personal property, but the plaintiffs are free to possess or sell their devices outside of Maryland.[5]  They, thus, retain an economic interest in their property, even though, as in *Serio*, they cannot lawfully possess the banned devices in Maryland.

Moreover, the firearms at issue in *Serio* were not intrinsically illegal in character and were only unlawful to possess due to the plaintiff's status as a convicted felon.  *See* 384 Md. at 396.  Here, in contrast, the State has properly exercised its police power in determining that rapid fire trigger activators are illegal to possess because of their inherent dangerousness.  Maryland law has long recognized that the State's broad police power encompasses the power "to determine not only what is injurious to the health, morals or welfare of the people, but also what measures are necessary or appropriate for the

---

[5] Regulatory efforts have reportedly increased the economic value of the devices banned by Maryland law.  *See* Polly Mosendz, *Bump Stock Prices Soar After Trump Proposes Ban*, BLOOMBERG (Feb. 21, 2018), https://www.bloomberg.com/news/articles/2018-02-21/bump-stock-prices-soar-after-trump-proposes-ban

protection of those interests." *Davis v. State*, 183 Md. 385, 297 (1944). This "exercise of the police power may inconvenience individual citizens, increase their labor, or decrease the value of their property," without running afoul of the State constitution. *Id.*

This Court should, thus, reject the plaintiffs' strained reading of Maryland law, under which the State would have no authority to ban possession of any dangerous or deleterious object no matter how compelling the State's interest in protecting public safety, merely because that object was purchased before its inherent dangerousness became widely known to the general public.

### III. THE STATUTE'S TERMS ARE NOT VOID FOR VAGUENESS.

The plaintiffs erroneously contend that a single provision of the General Assembly's definition of a rapid fire trigger activator—"the rate of fire increases"—is vague because it is broad enough to encompasses devices that do not modify or activate a trigger to achieve rapid fire, despite the clear and undisputed legislative purpose of the Law to ban devices that modify a firearm's rate of fire to mimic that of an automatic firearm.

At the outset, the plaintiffs do not allege that they own any such devices, and, thus, they lack standing to bring this vagueness challenge. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring a "concrete and particularized" injury to establish standing). Nor do any of the plaintiffs allege that they are under any threat of enforcement of the Law in the way they purport to interpret it, and, thus, their claims are not ripe for review. *See Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 759 (4th Cir. 2013) ("The hardship prong of our ripeness analysis is 'measured by the immediacy of the threat and

the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law.'" (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208-09 (4th Cir. 1992))).

Moreover, for the reasons discussed in the defendant's opening memorandum, the plaintiffs' vagueness challenge depends on a misinterpretation of the plain text of one statutory provision in the Law that is divorced from the statutory scheme as a whole and the statutory purpose. Both the Supreme Court and the Court of Appeals of Maryland have rejected the notion that a statute's terms should be read in isolation from the remainder of the statutory scheme and with no eye to the statute's clear purpose.

On the contrary, when construing a statute's text, the Supreme Court has instructed that courts "must . . . interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 134 S. Ct. 2259, 2266-67 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)); *see also King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[W]hen deciding whether the language is plain, [a court] must read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting *FDA v. Brown & Williamson*, 529 U.S. 120, 133 (2000))); *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) ("[W]hen considering phrases or words within a statute, those phrases or words should be considered in the context of the statute as a whole."). Likewise, the Court of Appeals of Maryland has made clear that because "'[t]he meaning of the plainest language is controlled by the context in which it appears, . . . related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered.'" *Brown v. State*, 454 Md. 546, 551

(2017) (citation omitted); *see also Smith v. State*, 425 Md. 292, 299 (2012) ("[Legislative] purpose becomes the context within which [courts] apply the plain-meaning rule. Thus results that are unreasonable, illogical or inconsistent with common sense should be avoided with the real legislative intention prevailing over the intention indicated by the literal meaning." (quoting *Allen v. State*, 402 Md. 59, 75 (2007))).

This is because "the meaning of a statute's 'words or phrases may only become evident when placed in context.'" *King*, 135 S. Ct. at 2489 (quoting *Brown & Williamson*, 529 U.S. at 132)). For a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Abramski*, 134 S. Ct. at 2267 n.6 (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)). As the Supreme Court has recognized, a court's "duty, after all, is 'to construe statutes, not isolated provisions.'" *King*, 135 S. Ct. at 2489 (quoting *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)).

Here, the statutory context, structure, history, and purpose, together with "common sense," *Abramski*, 134 S. Ct. at 2267, all demonstrate that the challenged provision of the definition of a "rapid fire trigger activator," to be codified at § 4-301(m)(1)(ii) of the Criminal Law Article of the Maryland Code, is not susceptible to the broad definition proffered by the plaintiffs that they allege renders the provision vague.

The Law criminalizes the possession, transfer, or sale of a particular object—a "rapid fire trigger activator." The title of the banned device that the General Assembly

chose when enacting the statute "shed[s] light on legislative intent," *Canaj, Inc. v. Baker & Div. Phase III, LLC*, 391 Md. 374, 407 (2006), and, therefore, bears on the fundamental issue of legislative purpose or goal [that] must . . . be considered" when interpreting Maryland statutes, *Brown*, 454 Md. at 551. Thus, interpreting the definition of a "rapid fire trigger activator" to encompass devices that do not in any way modify or activate the function of a firearm's trigger to allow for rapid fire, as the plaintiffs purport to, would be directly contrary to the clearest indication of what the General Assembly intended to ban, particularly because the Law's definition of what constitutes a "rapid fire trigger activator" does not expressly include such devices, nor is there any language in the statute that would compel that result.

The General Assembly defined a "rapid fire trigger activator" in two ways. First, a "rapid fire trigger activator" is defined as "any device . . . constructed so that, when installed in or attached to a firearm: (i) the rate at which the trigger is activated increases; or (ii) the rate of fire increases." 2018 Md. Laws, ch. 252, to be codified at Md. Code Ann., Crim. Law § 4-301(m)(1). This more generic definition is informed by the second definition of a "rapid fire trigger activator," which further clarifies the scope of the ban by providing a list of specifically-enumerated devices that constitute a "rapid fire trigger activator." *Id.*, to be codified at § 4-301(m)(2). These devices, in one way or another, all modify or activate the firearm's *trigger* such as to allow the firearm to achieve rapid fire that mimics fully automatic fire either by increasing the speed at which the trigger is

14

activated[6] or the amount of ammunition expelled with each pull of the trigger.[7] The generic definition of a "rapid fire trigger activator," when properly read in "context and with a view to [its] place in the overall statutory scheme," *King*, 135 S. Ct. at 2489, obviously was intended to reach any device that, like the specifically-enumerated devices, is constructed to allow the firearm to achieve rapid fire that mimics automatic fire by modifying or activating the trigger function.

This interpretation is further consistent with the "undisputed" purpose of the Law (ECF 23, Pls.' Opp'n at 33), which is to regulate devices that "modif[y a] firearm's rate of fire to mimic that of an automatic firearm." Test. of Sen. Victor R. Ramirez in Support of S.B. 707 (Senate Judicial Proceedings Committee) (ECF 9-2); *see also* Senate Judicial Proceedings Committee, Floor Report, S.B. 707 (2018) (ECF 9-3) (explaining that the legislation was intended to ban devices that "allow semi-automatic firearms to mimic the firing speed of fully automatic firearms and can achieve rates of fire between 400 to 800 rounds per minute"). Given this context, it defies common sense to interpret the generic definition of a "rapid fire trigger activator" to extend to devices that the plaintiffs acknowledge are not "attached to or serve to operate the trigger at any increased rate" nor

---

[6] A "bump stock," for example, "means a device, that when installed in or attached to a firearm, increases the rate of fire of the firearm by using energy from the recoil of the firearm to generate a reciprocating action that facilitates repeated activation of the trigger." 2018 Md. Laws, ch. 252, to be codified at Crim. Law § 4-301(f).

[7] A "burst trigger system," for example, "means a device that, when installed in or attached to a firearm, allows the firearm to discharge two or more shots with a single pull of the trigger by altering the trigger reset." 2018 Md. Laws, ch. 252, to be codified at Crim. Law § 4-301(g).

15

"are in anyway akin to, or function like," the specifically-enumerated banned devices.  ECF 1, Compl. ¶ 64.

Even divorced from the statutory context, structure, and purpose, nothing in the text of the challenged provision supports, much less compels, the plaintiffs' interpretation of the Law's scope.  The express language of the generic definition refers to devices that are "constructed so that, when installed in or attached to a firearm" a specific result occurs— "the rate at which the trigger is activated increases; or . . . the rate of fire increases."  The use of "so that" indicates that the resulting increased rate is the "purpose" of the device's construction.  *See* Webster's II New Riverside Univ. Dict. (defining use of "so that" to mean "in order that," which is defined as "for the purpose of").  The language, thus, makes plain that the resulting increase occurs because of how the device itself was constructed to impact the firearm, independent of a particular user's ability to fire off a faster shot by more rapidly pulling the trigger or loading the firearm.  Notably, the generic definition of a "rapid fire trigger activator" does not make any mention of or depend in any way on the *user* of the firearm; that is to say, a "rapid fire trigger activator" is not expressly defined to mean any device "constructed so that, when installed in or attached to a firearm" a user can increase the rate at which he or she loads or fires the weapon.

This omission is critical, because the plaintiffs' incorrect reading of the statute relies implicitly on the impact that a "rapid fire trigger activator" has on the *user's* potential to more rapidly fire or load a firearm when using a device that does not itself impact the firearm's trigger.  (*See* ECF 1, Compl. ¶ 62 (alleging statute could be read to apply to "muzzle weights, a variety of muzzle devices which reduce or redirect flash, certain fore

16

grips, certain sights, certain stocks (recoil reducing stocks) and a variety of recoil-reducing devices . . . which are designed to and do increase, by some small measure, the effective 'rate of fire' in the sense that they allow for faster, controlled follow-up shots"); *id.* ¶ 63 (alleging definition could include "revolver speed loaders, revolver speed strips and revolver moon clips, all of which permit a user to more rapidly reload a revolver and thus potentially increase the 'rate of fire' of the revolver"); ECF 23, Pls.' Opp'n at 30 (claiming statute is vague because "a device that helps one person fire faster than normal *for that person* may not make a bit of difference *for another person*" (emphasis in original)); *id.* at 31 (describing devices that allow user to more efficiently operate "a bolt which must be manually opened . . . [and] manually closed again for firing"); *id.* at 32 (referring to devices that "increase the potential rate of fire by making the firearm more controllable" for the user); *id.* at 32 (describing devices that "are designed to and do marginally increase the rate that a shooter can place a follow-up shot").)

Moreover, as described above, even if it were "ambiguous in isolation" as to whether the generic definition of a "rapid fire trigger activator" encompassed devices that merely increased the user's potential to fire follow-up shots or reload a firearm, the generic definition "is . . . clarified by the remainder of the statutory scheme," *Abramski*, 134 S. Ct. at 2267 n.6 (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)), which unambiguously extends only to devices constructed to modify a firearm's rate of fire to mimic that of an automatic firearm. *See King*, 135 S. Ct. at 2492 (where statutory language is ambiguous, courts "must turn to the broader structure of the [Law] to determine the meaning" of the statute at issue).

Further, unlike criminal prohibitions that have been found to be void for vagueness because they required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings," *United States v. Williams*, 553 U.S. 285, 306 (2008) (referring to vague terms such as "annoying" or "indecent"), a "rapid fire trigger activator" is defined by the Law without any reference to terms requiring subjective or speculative judgments.[8] Thus, even absent the obvious narrowing context of the Law as a whole, merely because the plaintiffs contend that the challenged language may be read to sweep in more conduct than the legislature intended does not render the statute vague. Rather, where a statute is capable of objective application, the potential risk that it may be enforced in a particular way is properly "the subject of an as-applied challenge." *Id.* at 302-03; *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 504 (1982) (explaining that even where "it is possible that specific future applications . . . may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise" (quoting *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 52 (1966) (alteration in *Vill. of Hoffman Estates*)); *Martin*, 700 F.3d at 137 ("A difference of opinion amongst judges or law enforcement does not make a statute unconstitutionally vague."); *Schleifer by Schleifer v. City of Charlottesville*, 159

---

[8] Although the plaintiffs contend that the "rate of fire" language "is wholly undefined by reference to any intelligible standard" (ECF 23 at 31), this is the same term used by ATF to explain that "bump-stock-type devices . . . are designed principally to increase the rate of fire of semi automatic firearms." 83 Fed. Reg. at 13,444. Other states have used it as well. *See, e.g.*, Cal. Penal Code § 16930(b) (defining a "multiburst trigger activator" to include "[a] manual or power-driven trigger activating device constructed and designed so that when attached to a semiautomatic firearm it increases the rate of fire of that firearm").

F.3d 843, 853 (4th Cir. 1998) ("Nullification of a law in the abstract involves a far more aggressive use of judicial power than striking down a discrete and particularized application of it.").

In any event, "[o]nly by taking a wrecking ball to a statute that can be salvaged through a reasonable narrowing interpretation," *Skilling v. United States*, 561 U.S. 358, 409 n.43 (2010), can the plaintiffs obtain the relief they truly seek—to gut entirely the criminal prohibition of bump stocks and other devices that modify a firearm's rate of fire to mimic automatic fire. Even if "[r]eading the statute to proscribe a wider range of offensive conduct" than clearly intended by the General Assembly "would raise the due process concerns underlying [a] vagueness challenge," this Court can "preserve the statute" *id.* at 408-09, by construing the definition of a "rapid fire trigger activator" to be codified at § 4-301(m)(1)(ii) narrowly to encompass only those devices that modify or activate a firearm's trigger to achieve rapid fire that mimics fully automatic fire. *See id.* (interpreting statutory prescription against "honest services" fraud narrowly to encompass only bribes and kickback schemes to avoid vagueness problems where there was "no doubt that Congress intended" the statute to extend at least to the narrowed scope of conduct).[9]

---

[9] The plaintiffs also argue that the phrase "a copy or a similar device" that follows the list of specifically-enumerated devices in the definition to be codified at § 4-301(m)(2) is susceptible to a vagueness challenge because those words should be read into the generic definition of a "rapid fire trigger activator" to be codified at § 4-301(m)(1). (*See* ECF 23, Pls' Opp'n at 33.) This is wrong for the simple reason that the words "a copy or a similar device" follow the specifically-enumerated devices and, thus, clearly were intended to relate to these specifically-enumerated devices. Thus, to the extent the plaintiffs' vagueness claim as to the definition to be codified at § 4-301(m)(1)(ii) survives the defendant's motion to dismiss, that has no bearing on the clear phrasing and purpose of "a

Finally, even if the plaintiffs' vagueness challenge to the statutory definition set forth in § 4-301(m)(1)(ii) survives the defendant's motion to dismiss, this Court should dismiss all of the plaintiffs' other claims because the remaining provisions of the Law are complete and capable of being executed in accordance with the legislative intent. *See* Md. Code Ann., Gen. Prov. § 1-210(a) ("Except as otherwise provided, the provisions of all statutes enacted after July 1, 1973, are severable."); *id.* § 1-210(b) (providing that a finding that "part of a statute is unconstitutional or void does not affect the validity of the remaining portions of the statute, unless . . . the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent").

## CONCLUSION

The Court should dismiss the plaintiffs' complaint in its entirety with prejudice.

                                    Respectfully Submitted,

                                    BRIAN E. FROSH
                                    Attorney General

                                    /s/ Jennifer L, Katz
                                    JENNIFER L. KATZ (Fed. Bar #28973)
                                    ROBERT A. SCOTT (Fed. Bar # 24613)
                                    Assistant Attorneys General
                                    200 St. Paul Place, 20th Floor
                                    Baltimore, Maryland 21202
                                    410-576-7005 (tel.); 410-576-6955 (fax)
                                    jkatz@oag.state.md.us

Dated: September 28, 2018               Attorneys for Defendant

---

copy or a similar device" as those words follow the list of specifically-enumerated devices set forth in the definition to be codified at § 4-301(m)(2).