# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MARYLAND SHALL ISSUE, et al.** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **CIVIL NO. JKB-18-1700** |
| **LAWRENCE HOGAN,** *in his official capacity as Governor of Maryland* | * | |
| **Defendant.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM

I.    *Introduction*[1]

On October 1, 2017, a gunman opened fire on a concert crowd in Las Vegas.  In the span of barely ten minutes, the attacker unleashed hundreds of rounds of ammunition, killing 58 people and injuring more than 850.  It was the deadliest mass shooting in the modern era.  (Brief of Amicus Curiae Giffords Law Center to Prevent Gun Violence in Support of Def. at 2, ECF No. 13-1.)  The shooter used semiautomatic rifles modified with devices known as "bump stocks," which enabled rapid fire approaching the rate of a fully automatic machine gun.  (*Id.* at 2, 4.[2])  According to the Department of Justice,

> [o]rdinarily, to operate a semiautomatic firearm, the shooter must repeatedly pull and release the trigger to allow it to reset, so that only one shot is fired with each pull of the trigger.  When a bump-

---

[1]    In this Introduction, in order to set the context, the Court takes notice of certain background facts about which there appears to be no genuine issue.

[2]    The Las Vegas shooter fired an estimated ninety rounds in ten seconds, while a fully automatic machine gun can fire approximately ninety-eight shots in seven seconds; by comparison, the rate of fire for an unmodified semiautomatic weapon is in the range of twenty-four rounds in nine seconds.  (*See* Amicus at 4 (citing Larry Buchanan, et al., *What Is a Bump Stock and How Does It Work?*, N.Y. Times (Feb. 20, 2018), https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-gun.html).)  The addition of a bump stock to a semiautomatic firearm can therefore mean an increase of hundreds of shots per minute.  *Id.*

> stock-type-device is affixed to a semiautomatic firearm, however, the device harnesses the recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by 'bumping' the shooter's stationary trigger finger without additional physical manipulation of the trigger by the shooter. The bump-stock-type device functions as a self-acting and self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger . . . .

Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, & Explosives (ATF), Bump-Stock-Type Devices, 83 Fed. Reg. 13442, 13443 (proposed Mar. 29, 2018) [hereinafter "DOJ Notice of Proposed Rulemaking"] (cited in Amicus Brief at 2).

Machine guns have been regulated under federal law for decades. *See e.g.*, National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872); Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 (codified as amended at 18 U.S.C. §§ 921–927, 929(a)). However, federal law does not classify most bump-stock-type devices as machine guns, despite their impact on a semiautomatic weapon's rate of fire. *See* DOJ Notice of Proposed Rulemaking, 83 Fed. Reg. at 13444–46 (summarizing the history of ATF decisions involving bump stocks). Largely unregulated, such devices are widely available, often for $200 or less. (Amicus Brief at 6.)

In the wake of the Las Vegas shooting, numerous elected officials called for changes to federal law. DOJ Notice of Proposed Rulemaking, 83 Fed. Reg. at 13446. Even the National Rifle Association publicly declared support for more stringent regulation. *See* Polly Mosendz & Kim Bhasin, *Bump-Fire Stock Prices Double, Thanks to the NRA*, Bloomberg (Oct. 5, 2017), https://www.bloomberg.com/news/articles/2017-10-05/bump-fire-stock-prices-double-thanks-to-the-nra (cited in Amicus Brief at 6 n.17). In early 2018, President Trump "directed the Department of Justice . . . 'to dedicate all available resources[,] . . . as expeditiously as possible, to propose for notice and comment a rule banning devices that turn legal weapons into

machineguns.'" DOJ Notice of Proposed Rulemaking, 83 Fed. Reg. at 13446 (quoting Exec. Office of the President, Memorandum for the Attorney Gen., Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices, 83 Fed. Reg. 7949, 7949 (Feb. 23, 2018)). Shortly thereafter, DOJ proposed a rule that would reclassify bump-stock-type devices as machine guns under federal law, *id.* at 13442, but no changes have yet been made.

The Maryland General Assembly moved more decisively. In April 2018, the democratically elected representatives of Maryland enacted Senate Bill 707, which made manufacture, sale, transport, or possession of "rapid fire trigger activators," including bump stocks and similar devices, unlawful in Maryland. 2018 Md. Laws ch. 252 (to be codified as amended at Md. Code Ann., Crim. Law §§ 4-301, 4-305.1, and 4-306) [hereinafter "SB-707"]. In crafting the law, legislators expressed concern about mass shootings, the lethality of firearms equipped with bump-stock-type devices, their unregulated status, and the danger to public safety. *See* S. Judicial Proceedings Comm. Floor Rep. on SB-707, at 4, 2018 Reg. Sess. (Md. 2018) (citing the Las Vegas shooting, lack of federal regulation, and the ability for such devices to enable "rates of fire between 400 to 800 rounds per minute"); Testimony of Sen. Victor R. Ramirez in Support of SB-707 at 2, S. Judicial Proceedings Comm., 2018 Reg. Sess. (Md. 2018) ("[T]here is no reason someone should be making a semi-automatic weapon into an automatic weapon[.] [W]ith the ban o[n] rapid fire trigger activators[,] we can . . . sav[e] . . . innocent lives, and minimiz[e] the magnitude of tragic events such as the Las Vegas shooting.") Seven other states similarly moved to restrict bump-stock-type devices. (Amicus at 11 n.33 (referring to laws in Connecticut, Delaware, Florida, Hawaii, New Jersey, Rhode Island, and Washington).)

In this case, a putative class action filed on June 11, 2018, Plaintiffs seek to invalidate SB-707's restrictions on bump stocks and similar devices. Plaintiff Maryland Shall Issue, Inc.

(MSI), a non-profit membership organization "dedicated to the preservation and advancement of gun owners' rights in Maryland," asserts claims on its own behalf, and on behalf of its members and others similarly situated. (Compl. ¶ 8, ECF No. 1.) Four individual MSI members are also named as individual plaintiffs. (*Id.* ¶¶ 9-12.) Plaintiffs have sued Governor Larry Hogan in his official capacity, alleging that SB-707 violates their constitutional rights under the Federal and State Constitutions. (*Id.* ¶ 3.) The Complaint puts forward five counts: a violation of the Takings Clause of the Fifth Amendment of the United States Constitution, applicable to the states via the Fourteenth Amendment (Count I); a violation of the Takings Clause of the Maryland Constitution, Article III, § 40 (Count II); a violation of the federal Due Process Clause, because of the imposition of an impossible condition (Count III); a violation of the federal Due Process Clause, because of vagueness (Count IV); and a violation of Article 24 of the Maryland Constitution, because of the abrogation of vested property rights (Count V). (*Id.*)

Currently before the Court is Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (ECF No. 9.) The issue is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, Defendant's motion will be granted as to all counts of the Complaint.

## II.    *Factual Background*

On April 24, 2018, Governor Hogan signed Senate Bill 707 ("the Act," or "SB-707") into law. (Compl. ¶ 13.) The Act makes it unlawful for any person to "manufacture, possess, sell, offer to sell, transfer, purchase, or receive a rapid fire trigger activator" or to "transport" such a device into the state. SB-707, sec. 2, § 4-305.1(a). Violation of the Act is a criminal misdemeanor subject to a term of imprisonment up to three years, a fine of up to $5,000, or both. SB-707, sec. 1, § 4-306(a).

The Act defines a "rapid fire trigger activator" to be "any device, including a removable manual or power-driven activating device, constructed so that, when installed in or attached to a firearm the rate at which the trigger is activated increases; or the rate of fire increases." SB-707, sec. 1, § 4-301(M)(1). The term is defined to include "a bump stock, trigger crank, hellfire trigger, binary trigger system, burst trigger system, or a copy or a similar device, regardless of the producer or manufacturer." § 4-301(M)(2). These named devices are defined as follows:

- "Bump Stock" is defined as "a device that, when installed in or attached to a firearm, increases the rate of fire of the firearm by using energy from the recoil of the firearm to generate a reciprocating action that facilitates repeated activation of the trigger." § 4-301(F).

- "Trigger Crank" is defined as "a device that, when installed in or attached to a firearm, repeatedly activates the trigger of the firearm through the use of a crank, a lever, or any other part that is turned in a circular motion." § 4-301(N).

- "Hellfire Trigger" is defined as "a device that, when installed in or attached to a firearm, disengages the trigger return spring when the trigger is pulled." § 4-301(K).

- "Binary Trigger System" is defined as "a device that, when installed in or attached to a firearm, fires both when the trigger is pulled and on release of the trigger." § 4-301(E).

- "Burst Trigger System" is defined as "a device that, when installed in or attached to a firearm, allows the firearm to discharge two or more shots with a single pull of the trigger by altering the trigger reset." § 4-301(G).

Finally, the Act exempts from the definition any "semiautomatic replacement trigger that improves the performance and functionality over the stock trigger." § 4-301(M)(3).

The Act contains an exception clause to permit certain individuals to continue to possess the otherwise prohibited devices in Maryland, provided that the individual:

> (1) possessed the rapid fire trigger activator before October 1, 2018; (2) applied to the [ATF] before October 1, 2018, for authorization to possess a rapid fire trigger activator; (3) received authorization to possess a rapid fire trigger activator from the [ATF] before October 1, 2019; and (4) is in compliance with all federal requirements for possession of a rapid fire trigger activator.

SB-707, sec. 2, § 4-305.1(b). Most provisions of the Act went into effect on October 1, 2018. (Compl. ¶ 13.) The requirement that an individual have received "authorization" from the ATF to qualify for the exception does not go into effect until October 1, 2019. SB-707, sec. 3.

On the same day that the Act was signed into law, the ATF issued a "Special Advisory" on its website stating that "ATF is without legal authority to accept and process" applications for authorization under the Act. (Compl. ¶ 32 (quoting Special Advisory, Bureau of Alcohol, Tobacco, Firearms & Explosives, Maryland Law Restricting 'Rapid Fire Trigger Activators,' (Apr. 24, 2018) [hereinafter ATF Special Advisory], https://www.atf.gov/news/pr/maryland-law-restricting-rapid-fire-trigger-activators).) The Advisory declared that "[a]ny such applications or requests will be returned to the applicant without action." (*Id.* (quoting ATF Special Advisory).)

According to the Complaint, Plaintiff MSI is a non-profit organization that works to "educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public." (Compl. ¶ 8.) Its purpose is to "promot[e] the exercise of the right to keep and bear arms," and to conduct activities including "education, research, and legal action focusing on the Constitutional right to privately own, possess and carry firearms and firearms accessories." (*Id.*) MSI sues on its own behalf, alleging that SB-707 "undermin[es] its message and act[s] as an obstacle to the organization's objectives and purposes," and sues on behalf of its members, who "currently possess 'rapid fire trigger activators' which are effectively and totally banned by" the Act. (*Id.*) The individual Plaintiffs, Paul Brockman, Robert Brunger, Caroline Brunger, and David Orlin, are all Maryland residents and MSI members, each of whom is alleged to have lawfully owned one or more of the devices prior to the Act's effective date. (*Id.* ¶¶ 9–11.) Plaintiffs seek compensatory damages for the

loss of their banned devices, as well as declaratory and permanent injunctive relief to bar enforcement of the Act.  (*Id.* ¶ 4.)

### III.    Standard for Dismissal under Rule 12(b)(6)

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In analyzing a Rule 12(b)(6) motion, the Court views all well-pleaded allegations in the light most favorable to the plaintiff.  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Nevertheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice.  *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557).  The Court must be able to infer "more than the mere possibility of misconduct."  *Id.* at 679.  In addition, the Court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

### IV.    Analysis

Although the Complaint alleges five counts, Plaintiffs have four main theories of relief:

- In Counts I and II, Plaintiffs argue that the Act is a per se taking without just compensation under the United States Constitution, as well as the Maryland Constitution, to the extent its Takings Clause follows federal law.  (*See* Compl. ¶ 21 (citing *Litz v. Md. Dep't of Env't.*, 131 A.3d 923, 930 (Md. 2016) ("[T]he decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities [for construing Article III, § 40].")).)

- In Counts II and V, Plaintiffs put forward a separate per se takings theory under the State Constitution—that the Act retrospectively abrogates vested property rights in

violation of Article 24, which also constitutes a taking under Maryland law. (*See id.* ¶ 70 (citing *Dua v. Comcast Cable of Md., Inc.*, 805 A.2d 1061, 1076 (Md. 2002) ("A statute having the effect of abrogating a vested property right, and not providing for compensation, does 'authoriz[e] private property[]' to be taken . . . without just compensation (Article III, § 40). Concomitantly, such a statute results in a person . . . being 'deprived of his . . . property' contrary to 'the law of the land' (Article 24).")).)

- In Count IV, Plaintiffs argue that the Act is unconstitutionally vague, because its terms can be read to encompass a number of devices that have only "minimal" impact on a firearm's rate of fire and are otherwise functionally and operationally dissimilar to bump stocks and other devices named in the Act. (*Id.* ¶¶ 61–66.)

- In Count III, Plaintiffs argue that ATF's refusal to process applications and grant authorizations for continued lawful possession makes it "legally impossible to comply" with the Act's exception clause, thus imposing a "legally impossible condition precedent" that violates due process and cannot be severed from the rest of the Act. (*Id.* ¶¶ 55–57.)

The Court will address each of these claims in turn.

Before analyzing Plaintiffs' claims, however, the Court must first address a preliminary jurisdictional issue. According to the Complaint, Plaintiff MSI sues on its own behalf (organizational or "individual" standing) and on behalf of its members (associational or representational standing). (*Id.* ¶ 8.) However, MSI does not allege a direct harm to itself sufficient to support standing in a non-representational capacity. A plaintiff's standing to sue in federal court is "an integral component of the case or controversy requirement" of Article III, implicating the court's subject matter jurisdiction. *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). "Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). The first requirement to establish standing is that a plaintiff shows that it has suffered an injury in fact to a legally cognizable interest that is "concrete and particularized." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Here, the only direct harm MSI alleges to support standing in its non-representational, organizational capacity is that the Act "undermin[es] [MSI's] message and act[s] as an obstacle

to the organization's objectives and purposes." (Compl. ¶ 8.) In short, MSI disagrees with the policy decisions of the Maryland Legislature embodied in SB-707, which are inconsistent with MSI's own policy objectives. To the extent this is an "injury" at all, it is neither concrete, nor particularized. "[A] mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient [to establish standing]." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

Therefore, MSI lacks standing to bring claims on its own behalf. Accordingly, in evaluating the motion to dismiss, the Court will only consider MSI's allegations as to harms suffered by its individual members.

### A. Takings Claim (Counts I and II)

Plaintiffs allege that SB-707 effects a "per se taking," because it bans the manufacture, sale, transfer, transport, possession, purchase, or receipt of rapid fire trigger activators without compensation. (Compl. ¶¶ 14, 18, 20–27, 49, 52.) The Court will first address this theory under the federal Takings Clause, and under Maryland's Taking Clause, Art. III, § 40, to the extent its protections are analogous to its federal counterpart. *Litz*, 131 A.3d at 930.

#### i. The Act regulates rapid fire trigger activators as contraband, a legitimate exercise of the state's traditional police power to regulate for public safety.

Plaintiffs argue that any ban on possession of personal property is a taking requiring payment of just compensation, no matter how dangerous or threatening the property might be to public safety. (Opp'n Mot. Dismiss at 7–8, 11–12, ECF No. 23). Under Plaintiffs' theory, a state may ban the sale or particular uses of existing items of personal property, but a state may never ban possession of *any* item that is already lawfully owned. (*Id.* ¶ 16 ("Maryland is not free to declare existing lawfully owned and lawfully acquired property to be 'contraband' . . . .").)

This theory would entail a radical curtailment of traditional state police powers, one that flies in the face of a long history of government prohibitions of hazardous contraband.

A state's interest in "the protection of its citizenry and the public safety is not only substantial, but compelling." *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017) (en banc). (*See also* Mot. Dismiss Mem. Supp. at 7, ECF No. 9-1.) In recognition of this and other important state police powers, the Supreme Court has routinely upheld property regulations, even those that "destroy[]" a recognized property interest, where a state "reasonably concluded that the health, safety, morals, or general welfare" would be advanced. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 125 (1978); *see also Mugler v. Kansas*, 123 U.S. 623, 668 (1887) ("A prohibition . . . upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking . . . ."); *cf. Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404, 411 n.2 (4th Cir. 2007) (stating that regulations for the public good in heavily regulated fields "per se do not constitute takings").

These principles are entirely consistent with the long history of state laws that criminalize, ban, or otherwise restrict items deemed hazardous under the police power. *See, e.g.*, Md. Code. Ann., Crim. Law §§ 4-303(a) (assault weapons), 4-305(b) (large capacity, detachable magazines), 4-402 to 4-405 (machine guns), and 4-503 (destructive, explosive, and incendiary devices, and toxic materials); Md. Code Ann., Crim. Law §§ 5-601(a) (controlled dangerous substances), 5-619(c) (drug paraphernalia), and 5-620(a) (controlled paraphernalia); Md. Code Ann., Crim. Law §§ 11-207(a)(4)–(5) (child pornography); Md. Code Ann., Envir. § 6-301 (lead-based paint); Md. Code Ann., Agric. § 9-402(6) (noxious weeds and exotic plants); Md. Code Ann., Pub. Safety § 10-104(a) (fireworks); *Kolbe v. Hogan*, 849 F.3d at 120 (assault weapons

and large capacity magazines); *see also Garcia v. Village of Tijeras*, 767 P.2d 355 (N.M. Ct. App. 1988) (pit bulls).[3]  Plaintiffs argue that many existing and past bans were more limited in scope than SB-707, for example, because they banned sale, but not possession, or banned possession, but not in all circumstances.  (Opp'n Mot. Dismiss at 11, 17–18.)  This only suggests that legislatures may have been persuaded, for political or policy-based reasons, that narrower laws were warranted under past circumstances.  In this case, the Maryland General Assembly concluded otherwise.  Plaintiffs point to no authority holding such prior legislative concessions to be constitutionally mandated.

Plaintiffs also make much of the fact that, prior to the passage of SB-707, rapid fire trigger activators were "lawful property" in Maryland, "not contraband."  (*Id.* at 16.)  Although true, this point is irrelevant.  Practically all products later defined as contraband were not contraband before the enactment of the law that named them as such.  Rapid fire trigger activators used to be lawful in Maryland, but SB-707 makes them unlawful.  This is a predictable and uncontroversial consequence of new criminal laws: they criminalize things that would not have been criminal but for the law.  Ignoring this basic truth about the nature of criminal legislation, Plaintiffs suggest that states can pass and enforce contraband laws only with respect to items that were already defined as contraband (*id.* at 15), a circular argument leading to absurd results—nothing could be contraband unless it was already contraband.  Under such an approach, public safety regulations would be permanently frozen in the past, and states would be inhibited

---

[3]  Contraband laws are also a normal part of the regulatory landscape at the federal level.  Although Congress lacks a broad police power to regulate for the general welfare, federal statues similarly criminalize, ban, and restrict contraband items, pursuant to Congress's enumerated powers.  *See, e.g.*, Controlled Substances Act of 1970, Pub. L. No. 91-513, 84 Stat. 1242 (illicit drugs); Firearms Owners' Protection Act, 100 Stat. at 449 (machine guns); Child Pornography Prevention Act of 1996, Pub. L. 104-208, sec. 121, 110 Stat. 3009-26 (child pornography); *Akins v. United States*, 82 Fed. Cl. 619 (2008) (firearm accessory known as the Akins accelerator); 16 C.F.R. § 1500.18 (lawn darts and other hazardous toys).

from addressing new threats to the public, no matter how grave. The Constitution does not tie the hands of state governments to such crippling effect.

To the contrary, in the context of firearms specifically, the Supreme Court confirmed that our nation's "historical tradition of prohibiting" "dangerous and unusual weapons" is entirely consistent with the Constitution. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *see also United States v. Pruess*, 703 F.3d 242, 246 n.2 (4th Cir. 2012) (quoting *Heller*, 554 U.S. at 627). The Court concluded that the Constitution "does not protect those weapons not typically possessed by law abiding citizens for lawful purposes," like machine guns (which rapid fire trigger activators mimic), or "sophisticated arms" designed for modern warfare. *Heller*, 554 U.S. at 625, 627. In upholding Maryland's assault weapons ban, the Fourth Circuit, applying these principles, reasoned that:

> like their fully automatic counterparts, the banned assault weapons are firearms designed for the battlefield, for the soldier to be able to shoot a large number of rounds across a battlefield at a high rate of speed. Their design results in a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns.

*Kolbe*, 849 F.3d at 125 (quotations and citations omitted). This rationale is equally applicable to SB-707's prohibition on rapid fire trigger activators, which are designed to enable a rate of fire approaching that of fully automatic guns. (Amicus Brief at 8–9.) *See also* DOJ Notice of Proposed Rulemaking, 83 Fed. Reg. at 13444 (describing the development of bump stocks as motivated by a desire for "affordable" alternatives to automatic weapons). The Maryland Legislature considered the ability of bump stocks and similar devices to inflict mass injury and mass casualties with great speed, as well as their use to horrific effect in Las Vegas. *See* S. Judicial Proceedings Comm. Floor Rep. at 4; Testimony of Sen. Ramirez at 1–2. It then

concluded that these devices pose such an unreasonable risk to public safety that they should be banned from Maryland.

Based on this legislative and constitutional history, the Court concludes that SB-707 falls well within Maryland's traditional police power to define and ban ultra-hazardous contraband.

### ii. The Supreme Court did not reject all consideration of traditional state police powers in all Takings Clause analyses.

Plaintiffs insist that, under current Supreme Court precedent, "the Takings inquiry is completely independent of the State's police power." (Opp'n Mot. Dismiss at 3.) Primarily relying on the Court's decision in *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992), they argue that proper exercises of the police power cannot prevent a regulation from being a compensable taking. (Opp'n Mot. Dismiss at 7–8, 11, 14.) In Plaintiffs' view, a state's power to declare dangerous property to be contraband will always be constrained by an obligation to pay just compensation if possession is banned—in effect, states cannot completely ban any item of personal property, no matter how dangerous, and no matter how compelling the state's interest in doing so, without compensating all individuals in the state who happen to already own it. (Mot. Dismiss Mem. Supp. at 12 ("Taken to its logical conclusion, the plaintiffs' theory would require the state to pay compensation [for new prohibitions on] . . . yet-to-be-developed drugs, poisons, toxic materials, explosives and the like.").) Although the Court must construe factual allegations in Plaintiffs' favor, the Court need not accept their interpretation of the law. *Wag More Dogs*, 680 F.3d at 365. Here, Plaintiffs' reliance on *Lucas* overstates that case's conclusions.

*Lucas* does acknowledge an inherent tension in subjecting takings inquiries in their entirety "to unbridled, uncompensated qualification under the police power," because, at the extreme, all property rights could be destroyed under that rationale. 505 U.S. at 1014. However, the Supreme Court's answer to this conundrum is not to dismiss traditional police power

justifications entirely, but, rather to subject such justifications to a certain degree of scrutiny, depending on the nature of the taking alleged—physical or regulatory, real or personal property. In a limited number of contexts, the Court applies per se rules, under which the very nature of the state action qualifies as a categorical taking, irrespective of the asserted justification. *Id.* at 1015 ("We have . . . described [a limited number of] discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint.").[4]

Outside of these categorical exceptions, the state's asserted justification for a regulation remains a relevant and important consideration. In *Lucas*, the Court reiterated this principle, noting that, although the language employed in takings analyses changed over time, the underlying principle remained consistent:

> The 'harmful or noxious uses' principle [employed in early cases] was the Court's early attempt to describe in theoretical terms why government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power.

*Id.* at 1022–23; *see also Penn Cent. Transp. Co.*, 438 U.S. at 125 ("[I]n instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted[,] . . . this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests [without compensation]."); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834 (1987) ("[L]and-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests . . . .'"). The holding in *Lucas* is entirely consistent with these background principles. 505 U.S. at 1026, 1028.

---

[4]     Recognized categories to which per se rules apply are discussed *infra*, Section IV.A(iii).

Of particular relevance to this case, *Lucas* distinguishes between real and personal property in discussing the extent to which the police power informs property rights and takings analyses:

> [O]ur 'takings' jurisprudence . . . has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; '[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power.' And *in the case of personal property*, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless . . . . *In the case of land*, however, . . . the notion . . . that title is somehow held subject to the 'implied limitation' that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture.

*Id.* at 1027–28 (emphases added) (citations omitted) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). The *Lucas* Court limited its skepticism of justifications based on the police power to those cases in which the State "eliminate[s] all economically valuable use" "*of land*." *Id.* (emphasis added). Simultaneously, the Court expressly recognized that personal property is held "subject to an implied limitation" greater than the implied limitation on real property and, under that limitation, interests in personal property occasionally "must yield to the police power." *Id.* Indeed, legitimate exercises of the police power may even render personal property "worthless." *Id. Lucas*, therefore, reaffirmed the appropriate and important role for the police power in property regulations in certain contexts, including many involving personal property. This is a far cry from the wholesale rejection of the police power that Plaintiffs attribute to *Lucas*.

At its broadest, *Lucas* might be read to suggest that this rationale limiting police power justifications extends to other contexts in which, like *Lucas*, a per se rule applies, but it extends no further. Plaintiffs attempt to characterize another landmark takings case, *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015), as rejecting that limited reading of *Lucas* and extending its rationale to all takings cases. *Horne* did no such thing. Like *Lucas*, the *Horne* majority similarly reiterated the appropriate role of the police power in some property regulations. 135 S. Ct. at 2427 (distinguishing regulatory from physical takings in considering the police power, and holding that only physical takings apply equally to real and personal property alike). Therefore, even under the broadest reading of *Lucas*, the Court will not ignore the compelling nature of Maryland's interest in passing SB-707 *unless* Plaintiffs first plausibly allege a per se taking under a categorical rule recognized by the Supreme Court. As discussed below, Plaintiffs fail to do so.

### iii. Plaintiffs fail to allege a taking under any of the per se theories recognized by the Supreme Court.

There are three categories of takings to which the Supreme Court has applied per se rules: (1) cases involving direct, physical appropriations (so-called "physical takings"), in which government takes title to or "physically takes possession of" real or personal property "for its own use," *see Horne*, 135 S. Ct. at 2425 (first quoting *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012); then quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324 (2002)); (2) cases in which a regulation "denies all economically beneficial or productive use of land," *see Lucas*, 505 U.S. at 1015; and (3) cases in which regulations compel a landowner to suffer "a permanent physical occupation of real

property," *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982). SB-707 falls into none of these categories. [5]

The per se rules exemplified by *Lucas* and *Loretto* do not apply to this case, because, by their very terms, they are limited to real property. *See Lucas*, 505 U.S. at 1119, 1028 (describing its holding as pertaining to "owner[s] of real property" and "the case of land"); *id.* at 1015–16 (positioning the opinion as part of a line of land use cases involving, e.g., inverse condemnation, subsurface mining rights, and government-mandated easements); *Horne*, 135 S. Ct. at 2427 (construing *Lucas* to mean that "implied limitations" under the police power are "not reasonable in the case of land"); *Loretto*, 458 U.S. at 427 (applying a per se rule to "a permanent physical occupation of real property"); *cf. Lucas*, 505 U.S. at 1015 (discussing *Loretto* as aligned with past land-use cases involving airspace and a navigation servitude on a private marina). This reading is consistent with Fourth Circuit precedent, as well. *See Holliday Amusements Co.*, 493 F.3d at 411 n.2 ("*Lucas* by its own terms distinguishes personal property.").

Plaintiffs assert that the distinction between real and personal property was "soundly rejected" by the Supreme Court in *Horne*, such that all takings theories now apply to real and personal property alike. (Opp'n Mot. Dismiss at 8.) In Plaintiffs' reading, *Horne* effectively threw out a century or more of Takings Clause jurisprudence, obliterating the traditional distinctions between real and personal property, and between direct, physical appropriations and regulations. (*See id.* at 14 (arguing that pre-*Horne* cases did not "survive" as binding precedent); *see also* Mot. Dismiss Mem. Supp. at 12.) But, *Horne* never characterized its holding as overruling precedent. Plaintiffs' theory suggests the Supreme Court overruled not just a single case but decades of jurisprudence without ever expressly acknowledging that its holding

---

[5]     Plaintiffs exclusively allege a *per se* theory. (Compl. at ¶¶ 49, 52.) They do not assert a regulatory taking under the ad hoc balancing test laid out in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). Accordingly, the Court will not evaluate their claim under that test.

represented a radical break from the past. This Court would decline to apply such a breathtaking sweep to *Horne* even if the Supreme Court had been silent as to the scope of its ruling; however, the Court plainly positioned its holding as leaving past approaches intact.

First, *Horne* traced the development of Takings Clause jurisprudence into two strands: direct government appropriations of property, which were the only kind of takings originally recognized; and regulatory takings, which were first acknowledged in early twentieth century cases. *Horne*, 135 S. Ct. at 2427. Then, the majority repeatedly limited its holding, that a per se rule applied to real and personal property alike, to the first strand—that is to "direct appropriations" or "government acquisitions of property" only. *Id.*; *see also id.* at 2425 (holding that a per se rule applied when the government "physically takes possession of an interest in property"). Far from claiming to overrule past cases, *Horne* positioned this holding as consistent with precedent, including *Lucas*: "The different treatment of real and personal property *in a regulatory case* . . . [does] not alter the established rule of treating *direct appropriations* of real and personal property alike." *Id.* at 2427–28 (emphases added). Finally, the Court acknowledged that, because the two strands are distinct, "[i]t is 'inappropriate to treat cases involving physical takings as controlling precedent for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Id.* at 2428 (quoting *Tahoe-Sierra Pres. Council*, 535 U.S. at 323). Thus, the Court made clear that its rejection of a distinction between real and personal property under the Takings Clause *only* applied to cases involving direct, physical appropriations. As such, the per se rules defined in *Lucas* and *Loretto* remain limited to real property. They do not apply to Maryland's ban on rapid fire trigger activators.

Plaintiffs have also failed to plausibly allege a per se taking under *Horne*'s direct appropriation rule. The challenged regulation in *Horne* constituted a physical taking because it

mandated that private property owners transfer title and possession of personal property directly to the government.  *Id.* at 2424 ("The [challenged order] requires growers in certain years to give a percentage of their crop to the Government, free of charge. . . . [A government body] acquires title to the reserve raisins that have been set aside, and decides how to dispose of them in its discretion.").  Plaintiffs argue that SB-707 "depriv[es] plaintiffs of physical possession of their property, just as the federal government in *Horne* physically deprived the plaintiff . . . of physical possession of the raisins."  (Opp'n Mot. Dismiss at 8–9).  That is, Plaintiffs claim that their rapid fire trigger activators have been "actually occupied or taken away," "directly appropriat[ed]," and "physically surrender[ed]," just like the raisins in *Horne*.  (*Id.* at 8 (quoting *Horne*, 135 S. Ct. at 2427, 2429).)  But, *Horne* was not a case about a regulation that burdened possession in a way that might be considered analogous to government confiscation of personal property; *Horne* was a case about *actual* government confiscation of personal property.  Its holding places a critical emphasis on that fact.  *Horne*, 135 S. Ct. at 2428 ("The reserve requirement . . . is a clear physical taking.  Actual raisins are transferred from the growers to the Government.  Title to the raisins passes to [a government entity].").  The Court acknowledged that an indirect regulation with the "same economic impact" on raisin growers would have been permissible, even though direct confiscation was not, because "[t]he Constitution . . . is concerned with means as well as ends."  *Id.*  It is undisputed in this case that SB-707 involves neither a confiscation of rapid fire trigger activators by the State of Maryland, nor a mandate for Plaintiffs to cede title to or possession of them to the State.  Therefore, SB-707 does not effect a direct government appropriation of rapid fire trigger activators under *Horne*.[6]

---

[6]  In a few places, the *Horne* majority implies that *Loretto*, which involved a law requiring a landowner to permit permanent physical occupation of its rooftop by a private third party, could be understood as a physical taking case.  *See* 135 S. Ct. at 2426 (citing *Loretto*, 458 U.S. at 426–35); *id.* at 2427 (citing *Loretto*, 458 U.S. at 435).  If so, *Horne* might suggest that *Loretto*'s rationale—in which a private third party is granted possession,

Thus, Plaintiffs do not assert a per se taking under any of the three discrete categories recognized by the Supreme Court. Instead, Plaintiffs' propose a new per se rule: that "[b]anning possession is a per se taking." (Opp'n Mot. Dismiss at 7.) No Supreme Court or Fourth Circuit precedent has ever adopted such a rule. Plaintiffs attempt to locate their rule in *Loretto*, arguing that banning possession is a per se taking because it is "so onerous that its effect is tantamount to a direct appropriation or ouster." (Opp'n Mot. Dismiss at 14.) However, this quoted language, which Plaintiffs repeatedly misattribute to *Loretto*, does not appear anywhere in that case.[7]

---

rather than the government—could apply equally to personal property. At most, this might mean that a regulation mandating that title or possession of personal property be permanently transferred to a private third party would also qualify as a per se physical taking. However, any such implication was not essential to *Horne*'s holding, because *Horne*—which involved direct government confiscation of the raisins—was not that case. Because SB-707 does not purport to allocate permanent possession of Plaintiffs' rapid fire trigger activators to private third parties, this is not that case either.

Plaintiffs cite no case in which a burden on possession of personal property was found to be violate the Constitution *unless* direct government appropriation was involved. *See Nixon v. United States*, 978 F.2d 1269, 1285 (D.C. Cir. 1992) ("[T]he Act authorized [a government official] to assume complete possession and control of [the] presidential papers."); *see also Serio v. Baltimore Cty.*, 863 A.2d 952, 966 (Md. 2004) (police and County officials seized and retained a handgun in violation of due process). Thus, Plaintiffs' fail to identify any case law supporting their expansive reading of *Horne*.

[7] In what appears to be, at best, a gross oversight in Plaintiffs' legal research, the quoted language Plaintiffs misattribute to *Loretto*, about regulation "so onerous that its effect is tantamount to a direct appropriation or ouster," appears to have originated in a different opinion, never cited by Plaintiffs, and issued more than twenty years after *Loretto*: *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). Even had Plaintiffs correctly attributed the language to *Lingle*, it would still fail to support their proposed per se rule.

*Lingle*, which involved a challenge to a Hawaii law limiting the amount of rent oil companies could charge for company-owned oil stations, was a regulatory takings case involving restriction of a commercial use of real property. *Id.* at 533. It neither created nor applied any per se rules, and it did not discuss personal property regulations at all. The misquoted language appears in a passage describing general developments in the history of Takings Clause jurisprudence, as a paraphrase of *Pennsylvania Coal v. Mahon*, the milestone case first recognizing the possibility that a land regulation not involving government appropriation might nonetheless be compensable if it "goes too far." *Id.* at 537 (quoting *Mahon*, 260 U.S. at 415). At most, the *Lingle* Court was thus expressing a general background principle about regulatory takings, but it did not put forth "tantamount to a direct appropriation or ouster" as a doctrinal test—not in general, and not as a test for identifying new per se rules. Rather, in the ensuing paragraphs, the *Lingle* majority explicitly recounted the three recognized tests courts should apply to non-physical, regulatory takings claims: the per se rule exemplified by *Lucas* (which this Court already concluded does not apply to this case); the per se rule exemplified by *Loretto* (which this Court similarly concluded does not apply here); and the multi-factor balancing test announced in *Penn Central* (which Plaintiffs do not allege as a theory of relief). *Id.* at 538–40. The primary purpose of the *Lingle* opinion was to resolve confusion about the appropriate doctrinal tests for takings, and whether a ban on personal property is "tantamount to direct appropriation" is not one of the tests it identified. *See id.* at 548.

Plaintiffs also imply that *Horne* extended the per se rule they incorrectly attribute to *Loretto* to the context of personal property. (Opp'n Mot. Dismiss at 14.) However, *Horne* never used the misquoted language, either; the

Plaintiffs' purported per se rule is thus rooted in a perplexing and unambiguous misstatement of the rule announced in *Loretto*—a rule that, as already discussed, does not govern this case. *See supra* pp. 16–18, 19 n.6.

Plaintiffs also rely heavily on *Andrus v. Allard*, 444 U.S. 51 (1979), in which the Supreme Court concluded that a ban on the sale of eagle feathers did not constitute a taking, as another ostensible source of their per se rule. Plaintiffs emphasize that, in that case, the challenged regulation "[did] not compel surrender of the artifacts," there was "no physical invasion" of them, and existing feather owners "retain[ed] the right to possess and transport their property." (Opp'n Mot. Dismiss at 9–10 (citing *Andrus*, 444 U.S. at 65–66).) According to Plaintiffs, *Andrus* and *Horne* together make possession "dispositive" of a per se taking. (*Id.* at 10.) However, Plaintiffs' reading flips the holding in *Andrus* on its head. *Andrus* held that, where a property owner retains possession, control, and non-sale disposition rights in personal property, a taking has not occurred. 444 U.S. at 66–68. *Andrus* never draws a bright line rule making the retention of all those rights—or of any one of them—dispositive in favor of finding a taking. Nor did *Horne* read *Andrus* to create such a rule. In *Horne*, the Court distinguished *Andrus* because, unlike the eagle feather regulation, "the raisin program requires physical surrender of the raisins and transfer of title" to the government. 135 S. Ct. at 2429. Possession alone was not the dispositive factor.[8] *Cf. Serio*, 863 A.2d at 966 (finding the plaintiff to retain

---

majority never cites *Lingle* at all. *Horne*, 135 S. Ct. at 2424–33. It could not have adopted language it never used as the doctrinal test for per se takings of personal property.

There is one final irony in Plaintiffs' puzzling and mistaken reliance on this language from *Lingle*. In *Lingle*'s opening line, the Court remarked that "[o]n occasion, a would-be doctrinal rule or test finds its way into our case law through simple repetition of a phrase—however fortuitously coined." *Lingle*, 544 U.S. at 531. This is precisely what Plaintiffs attempt to do with an out-of-context, misquoted phrase—improperly transform it into a "would-be doctrinal rule." Even if properly attributed, this Court would decline to take the bait.

[8] It is also worth noting that, unlike in *Horne*, Plaintiffs indisputably retain rights to possess, transfer, or use rapid fire trigger activators outside of Maryland. (Mot. Dismiss Mem. Supp. at 9, 10 n.6; Opp'n Mot. Dismiss

meaningful property rights despite a ban on personal possession).  Unlike *Horne*, SB-707 does not require Plaintiffs to physically surrender their devices or transfer title to the government.

The only case providing support for Plaintiffs' theory that possession bans are per se takings is a recent Ninth Circuit case.  *Duncan v. Becerra*, Civ. No. 17-56081, 2018 WL 3433828 (9th Cir. July 17, 2018), *aff'g* 265 F. Supp. 3d 1106 (S.D. Cal. 2017).  Notably, that case affirmed, under an abuse of discretion standard, a district court decision that conflicts with binding Fourth Circuit precedent on crucial questions, including whether large-capacity magazines are protected by the Second Amendment and the scope of *Lucas*'s limitation on the police power.  *Compare Duncan*, 2018 WL 3433828, at *1 (no abuse of discretion in finding that the Second Amendment protects large capacity magazines), *and id.* at *3 (affirming the district court's reliance on *Lucas* to reject California's police power justification for its regulation of personal property), *with Kolbe v. Hogan*, 849 F.3d at 137 (finding no Second Amendment protection for large-capacity magazines), *and Holliday Amusements Co.*, 493 F.3d at 411 n.2 (limiting *Lucas*'s dismissal of police power justifications to real property).  A single case in a non-controlling jurisdiction that is inconsistent with binding authority on related legal questions is not enough to overcome the weight of authority against Plaintiffs' position.

Thus, reading all alleged facts in Plaintiffs' favor, Plaintiffs failed to plausibly allege a per se taking under any theory recognized in federal Takings Clause jurisprudence.  Accordingly, Count I will be dismissed in full, and Count II will be dismissed insofar as it relies on federal law to establish a per se taking under the Maryland Constitution.

---

at 26–27 (acknowledging but dismissing possible out-of-state uses).)  However, the Court's conclusion that no taking has occurred does not depend on these out-of-state uses.

### B. Abrogation of Vested Rights (Counts II and V)

Plaintiffs allege a separate per se theory under the Maryland Constitution. Plaintiffs argue that SB-707 "abrogate[es] a vested property right" in violation of Article 24's protection against "retrospective statutes," and that an Article 24 violation, in turn, constitutes a taking under Article III, § 40. (Compl. ¶¶ 68–73; *see also id.* ¶ 52.) Under Maryland law, "retrospective statutes are those that 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" (*Id.* ¶ 72 (quoting *Muskin v. State Dep't of Assessments & Taxation*, 30 A.3d 962, 969 (Md. 2011)).) According to Plaintiffs, SB-707 violates this rule because Plaintiffs have a "vested property interest in the possession of their devices," a right that was abrogated when SB-707 made future possession of those devices unlawful. (*Id.* at ¶ 68.)

The first problem with this theory is that it is not at all clear how SB-707's provisions can be understood to operate retrospectively. It is not as if SB-707 rendered Plaintiffs' past lawful purchases of rapid fire trigger activators to have been unlawful as of the date of purchase; nor did it retroactively impose the exception clause's authorization requirements. Such effects would have "increas[ed] . . . liability for past conduct," or "impair[ed] rights" and "impos[ed] new duties with respect to transactions already completed." *Muskin*, 30 A.3d at 969. By its terms, SB-707 operates on a purely prospective basis: passed in April 2018, it bans in-state possession after October 1, 2018, with the exception of authorization requirements that go into effect gradually, first in October 2018 and then in October 2019. SB-707, sec. 4. This statutory structure is not retrospective, as Plaintiffs define the term under Maryland law.

There is a second, even more fundamental flaw in Plaintiffs' theory. Plaintiffs provide no authority for the proposition that Maryland law recognizes, under Article 24, "vested" rights to possess tangible personal property like rapid fire trigger activators in perpetuity. The cases cited

by Plaintiffs concern vested rights to real property, contract rights, and previously accrued causes of actions—none pertains to personal property. *See Muskin*, 30 A.3d at 971 (reversionary rights in ground rent leaseholds); *Dua v. Comcast Cable of Md.*, 805 A.2d at 1078 (rights under pre-existing contracts); *id.* (accrued cause of action limited by a new statute of limitation).

Plaintiffs emphasize that Maryland law "may impose greater limitations" on the abrogation of vested property rights than federal law. (Compl. ¶ 71 (quoting *Muskin*, 30 A.3d at 968–69 (indicating that Maryland law may be broader than federal counterparts "under some circumstances")).) Even if so, that does not necessarily mean that Maryland's "vested rights" jurisprudence equally encompasses all property rights without regard for the nature of the property in question. To the contrary, the Maryland Court of Appeals, in discussing the scope of Article 24's protection of "vested" rights, made explicit that some categories of property—namely contract rights and real property—are more strongly protected than others. *See, e.g.*, *Muskin*, 30 A.3d at 972 ("[I]n the spectrum of vested rights recognized previously by this Court, [vested causes of action] are not as important as the vested real property and contractual rights which have almost been sacrosanct in our history."); *id.* at 974 (similarly emphasizing the central importance of "[r]eal property and contractual rights" as "the basis of economic stability"). Plaintiffs have not identified a single Maryland case suggesting that rights in tangible personal property can "vest" for the purposes of Article 24.

The Court therefore concludes that Plaintiffs' *per se* theory under Maryland law also fails.[9] Accordingly, Counts II and V will be dismissed.

---

[9]      Plaintiffs also cite *Steuart v. City of Baltimore*, 7 Md. 500 (1855), for the proposition that bills passed by the Maryland Legislature that take property are void if they do not include a provision for compensation "being first paid." (Compl. ¶ 25.) In *Steuart*, the Court of Appeals concluded that no taking occurred where a plaintiff had already accepted payment and still remained "secure[] in the use and enjoyment of his property." 7 Md. at 516. It does not appear to announce a rule about the required remedy in the event a law *does* effect a taking but fails to provide for compensation by its own terms. However, because the Court concludes that SB-707 does not constitute a taking, the Court need not consider what the appropriate remedy would have been, had a taking occurred.

### C. Void for Vagueness (Count IV)

Plaintiffs next argue that SB-707 is unconstitutionally vague in defining a rapid fire trigger activator as "any device . . . constructed so that, when installed in or attached to a firearm[,] the rate at which the trigger is activated increases; *or the rate of fire increases*." (Compl. ¶ 61 (emphasis added) (quoting § 4-301(M)(1)).) According to Plaintiffs, this definition can be read to encompass any number of firearm accessories that "allow for faster, controlled follow-up shots" and, therefore, might "increase, by some small measure, the effective 'rate of fire.'" (*Id.* at ¶ 62.) Plaintiffs cite muzzle weights, fore grips, recoil-reducing devices, and devices that redirect flash as items that could be covered by this reading of SB-707. (*Id.*) In addition, because the Act does not by its terms limit its scope to devices that operate on semiautomatic weapons, Plaintiffs further claim that accessories that "permit a user to more rapidly reload a revolver" could also be interpreted as minimally increasing the "rate of fire." (*Id.* at 63.) For these reasons, Plaintiffs argue that the Act fails to provide "fair notice of the conduct [it] proscribes" and risks "arbitrary and discriminatory law enforcement," in violation of due process. (*Id.* at ¶ 60 (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2015)).)

The Court cannot reach the merits of Plaintiffs' vagueness claim, because Plaintiffs failed to establish standing with respect to this count of the Complaint. Although Defendant's motion was filed as a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court may construe the motion as one filed under Rule 12(b)(1) when the Court's subject matter jurisdiction is implicated. *Hawkins v. Elaine Chao*, Civ. No. JKB-16-3752, 2017 WL 5158349, at *1 (D. Md. Nov. 7, 2017).

In mounting a pre-enforcement facial challenge to a criminal law, a plaintiff can establish constitutional standing by demonstrating (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," and (2) a "credible threat of prosecution" under

the Act. *Hamilton v. Pallozzi*, 165 F. Supp. 3d 315, 320 (D. Md. 2016) (quoting *W. Va. Citizens Def. League, Inc. v. City of Martinsburg*, 483 F. App'x 838, 839 (4th Cir. 2012) (per curiam)), *aff'd*, 848 F.3d 614 (4th Cir. 2017); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (requiring "a realistic danger of sustaining a direct injury as a result of the statute's operation"). At the motion to dismiss stage, Plaintiffs bear the burden of alleging sufficient facts, considered in the light most favorable to them, to support subject matter jurisdiction. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). "When plaintiffs 'do not claim that they have ever been threatened with prosecution [or] that a prosecution is likely,' . . . they do not allege a dispute susceptible to resolution by a federal court." *Babbitt*, 442 U.S. at 298–99 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

Here, Plaintiffs do not allege any facts suggesting a "credible threat" that the Act will be enforced in accordance with Plaintiffs' broad reading. Plaintiffs do not claim to have been threatened with prosecution on the basis of their possession of the additional devices as to which SB-707 is allegedly vague. Nor do they allege that any state official with enforcement authority has made statements or taken actions from which the Court might infer intent to prosecute in such a manner. All Plaintiffs allege is that a literal reading of one clause of SB-707's definition of a rapid fire trigger activator, taken in isolation from the additional provisions that make up the definition section, might encompass devices that Plaintiffs themselves acknowledge are not "in anyway [*sic*] akin to" and do not "function like" the devices specifically named as "rapid fire trigger activators" in the Act. (Compl. ¶ 64.) In order for Plaintiffs to face a risk of "direct injury" from overbroad enforcement, *Babbitt*, 442 U.S. at 298, an enforcement agent would need to conclude that a "rapid fire trigger activator" includes accessories that, in Plaintiffs' own words, do not "attach[] to or serve to operate the trigger" (Compl. ¶ 64), and then actually

attempt to enforce the Act accordingly, without any superseding authority intervening. Plaintiffs simply have not alleged any facts suggesting that the threat of such enforcement rises above pure "speculation" and "conjecture." *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (dismissing as "conjecture" the notion that police will routinely enforce the law unconstitutionally and as "speculation" the possibility that the plaintiff would be part of a traffic stop in future that would lead to an arrest and provoke the use of a chokehold).

Because Plaintiffs have not alleged facts from which the Court could infer a credible threat of prosecution, Plaintiffs lack standing to mount a pre-enforcement challenge on vagueness grounds. Accordingly, Count IV will be dismissed. Plaintiffs are free to return to the courts later should there be an actual record or imminent threat of enforcement on the grounds alleged.

### D. Impossibility of Complying with the Exception Clause (Count III)

Plaintiffs' final claim is that SB-707 violates due process, because the ATF's position that it is "without legal authority" to process applications for authorization makes it legally impossible for Plaintiffs to comply with the Act's exception clause. (Compl. ¶ 34.) *See also* ATF Special Advisory. Plaintiffs further argue that the invalid exception clause cannot be severed from the rest of SB-707 under a "long-established" rule of statutory interpretation:

> [W]here the Legislature enacts a prohibition with an excepted class, and a court finds that the classification is constitutionally infirm, the court will ordinarily not presume that the Legislature would have enacted the prohibition without the exception, thereby extending the prohibition to a class of persons whom the Legislature clearly intended should not be reached.

(*Id.* ¶ 36 (quoting *State v. Schuller*, 372 A.2d 1076, 1083 (Md. 1977)).) Therefore, Plaintiffs conclude, SB-707 must be struck down in its entirety. (*Id.* ¶ 38.)

Assuming that ATF's announced position makes it completely impossible for any individual to obtain authorization prior to the 2019 deadline, Plaintiffs still fail to state a plausible claim for relief.[10] Even if it is impossible to access the exception in SB-707, it is *not* impossible to comply with the statute overall. The statute does not obligate current owners of prohibited devices to obtain ATF authorization; it obligates them not to possess rapid fire trigger activators within the state of Maryland, *unless* they obtain ATF authorization prior to the statutory deadline. §§ 4-305.1(a), (b). In the absence of authorization, Plaintiffs can fully comply with the statute by moving, storing, or selling their devices out of state, or by destroying them. Plaintiffs offer no facts suggesting any of these alternative means of compliance is impossible.

A comparison to *Hughey v. JMS Dev. Corp.*, relied on by Plaintiffs, is instructive. In *Hughey*, the Eleventh Circuit dissolved an injunction against defendant JMS under the citizen suit provision of the Clean Water Act (CWA), because it concluded that compliance with the CWA was impossible under the circumstances. 78 F.3d 1523, 1530 (11th Cir. 1996). The substantive provision at issue imposed a "zero discharge" standard for rain water runoff on JMS, unless the discharge was made in accordance with the terms of a permit issued under EPA authority. *Id.* at 1524–25. In JMS's case, the Georgia Environmental Protection Division (EPD) would have had to issue such a permit, because the EPA had previously designated EPD as the exclusive authority to administer the program within Georgia. *Id.* at 1525. At the time JMS was in operation, JMS could not obtain a federal permit because of the grant of exclusive authority to

---

[10]     The impossibility of obtaining authorizations is not a foregone conclusion. The authorization requirement does not go into effect for another eleven months, SB-707, sec. 3, and, at the time the Special Advisory was issued, ATF was actively reconsidering the legal status of bump stocks and similar devices under federal law. *See* DOJ Notice of Proposed Rulemaking, 83 Fed. Reg. at 13442. As yet, no final decision has been announced. Therefore, it is not beyond the realm of possibility that the ATF might alter its position at some point before the statutory deadline expires. However, because all facts and inferences must be construed in Plaintiffs' favor at this stage, the Court assumes that ATF authorization will be impossible to obtain for the purposes of this analysis.

EPD, but EPD permits were not yet available. *Id.* at 1525–26. However, the permit's unavailability, on its own, did not render compliance impossible. In addition, the evidence was "uncontroverted" that compliance with a zero-discharge standard for rain water was factually impossible under any circumstance, because "whenever it rained[,] . . . some discharge was going to occur." *Id.* at 1530. JMS "could not stop the rain water that fell on [its] property from running downhill, and [in fact] nobody could." *Id.* Importantly, JMS could not even "abate the discharge . . . by ceasing operations." *Id.* Therefore, the mere fact that a permit to access the statutory exception was unavailable was not enough to render compliance impossible. It was the combination of a legally unavailable permit alongside the factual impossibility of achieving substantive compliance through any other means, including halting operations entirely. The contrast to this case is plain: while it may be impossible for Plaintiffs to access the exception, substantive compliance remains fully within Plaintiffs' control. To comply, all they need to do is move the banned devices out of state or get rid of them altogether.

In other cases cited by Plaintiffs, the unavailability of an exception itself created a constitutional problem. *See, e.g.*, *Broderick v. Rosner*, 294 U.S. 629, 639, 647 (1935) (holding that the impossibility of fulfilling the requirements of an exception permitting New Jersey courts to exercise jurisdiction violated the Full Faith and Credit Clause); *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (enjoining ordinances preventing access to gun ranges, where the City mandated range training as a condition of lawful handgun possession, and, therefore, such access implicated Second Amendment rights).[11] As discussed *supra*, Plaintiffs have failed to

---

[11] Plaintiffs also cite *United States v. Dalton*, 960 F.2d 121 (10th Cir.1992), but *Dalton*'s reasoning, which is non-binding on this Court in any event, does not extend to this case either. First, the statutes at issue in *Dalton* are distinguishable. In that case, the defendant was convicted of violating provisions of the Internal Revenue Code criminalizing possession of an unregistered machine gun and failure to register a machine gun. I.R.C. §§ 5861(d), (e). The Tenth Circuit reversed the convictions after concluding that, for both statutes, the central conduct that was criminalized was a failure to register, but registration was legally impossible under a later statute. *Id.* at 122, 124 (finding that the inability to register the gun was "undisputed," and that "the failure to register is a fundamental

establish a plausible claim under any of their other constitutional theories. None of the Court's conclusions in dismissing those constitutional claims predicated the constitutionality of SB-707 on the existence of an accessible exception clause. In short, the factual impossibility of obtaining authorization for continued lawful ownership in Maryland presents no constitutional problem in this case; nor have Plaintiffs alleged that the exception clause is itself dependent on any constitutionally suspect classification. Therefore, the exception clause is not invalid.

Plaintiffs' remaining arguments about severability need not be addressed, because there has been no threshold finding that any provision of the law is unconstitutional or otherwise invalid. *See O.C. Taxpayers for Equal Rights, Inc. v. Mayor & City Council of Ocean City*, 375 A.2d 541, 551 (Md. 1977) (holding that a voting restriction contained an "invalid exception" that violated equal protection before considering severability); *Schuller*, 372 A.2d at 1082, 1083–84 (first concluding that an exception to an anti-picketing statute was "constitutionally infirm" for violating freedom of speech and equal protection and then finding that it could not be severed). Having concluded that SB-707's exception clause is not invalid, the Court need not consider whether it would be severable.[12]

---

ingredient of [the I.R.C. provisions]"). However, all parties agreed that there would have been no ground for objection had the defendant been tried and convicted for violating the later statute, 18 U.S.C. § 922(*o*), which criminalized possession, rather than failure to register. *Dalton*, 960 F.2d at 123. *Dalton* is thus limited to the specific statutory scheme under the I.R.C., which "clearly evince[d] Congress's intent that the Act regulate machineguns through a proper exercise of the taxing power," rather than through an outright ban. *Id.* at 124.

Second, and more importantly, *Dalton* is a post-conviction challenge, not a pre-enforcement suit. The defendant sought relief from a specific criminal penalty imposed under specific circumstances. Here, Plaintiffs seek to invalidate SB-707's statutory scheme *in toto*. Although the Tenth Circuit reversed the convictions, nothing in *Dalton* even remotely suggests that the underlying prohibition on possession was invalid or that the defendant therefore retained a right to possess the firearm in question—which is ultimately what Plaintiffs seek here.

[12] Although the Court need not reach the severability question, there are a few aspects of Plaintiffs' argument that warrant comment. Plaintiffs seem to read SB-707's exception clause as evidence of a clear intent on the part of the Maryland Legislature to exempt an entire class of existing owners—or at least some of them—from the prohibition on possession of rapid fire trigger activators. (*See* Compl. ¶¶ 33, 36–37.) However, the design of the statute's exception clause does not support that conclusion.

Had the Legislature intended to guarantee a path to continued lawful possession, it could have followed the example of past Maryland firearms regulations and crafted either a straightforward grandfather clause excepting all

Accordingly, Count III will be dismissed.

## V.   *Conclusion*

For the foregoing reasons, an order shall enter granting Defendant's motion to dismiss (ECF No. 9) as to all counts of the Complaint. Plaintiff MSI, in its non-representational capacity, lacks standing to pursue relief on its own behalf. Accordingly, it will not be permitted to bring claims in that capacity. As to Plaintiffs' remaining claims, Count IV of the Complaint will be dismissed under Federal Rule of Civil Procedure 12(b)(1), and Counts I, II, III, and V will be dismissed under Federal Rule of Civil Procedure 12(b)(6).

DATED this 15th day of November, 2018.

BY THE COURT:

_____/s/_____

James K. Bredar
Chief Judge

---

lawful purchases prior to a certain date, *see, e.g.*, Md. Code Ann., Crim. Law § 4-303(b)(2) (exception to assault long gun ban for licensed dealers in lawful possession before October 1, 2013), or a registration or authorization requirement involving a state agency to whom the Legislature could have delegated the requisite authority, *see, e.g.*, § 4-303(b) (exception clause in assault pistol ban requiring registration with the Maryland State Police); § 4-403(c)(1) (same requirement in machine gun regulation). Instead, the exception scheme as enacted made continued lawful possession contingent on the independent legal and policy decisions of a federal agency over which Maryland has no control. Furthermore, at the time SB-707 was enacted, the very federal agency it placed in charge of authorization was actively reconsidering the status of bump stocks and similar devices under federal law, including a proposal to redefine them as machine guns subject to stringent, existing regulations. DOJ Notice of Proposed Rulemaking, 83 Fed. Reg. at 13442. Because the status of such devices was, at best, unsettled at the time SB-707 was passed, it seems reasonably foreseeable that ATF might have decided to deny every single application received as a matter of federal policy or of binding federal law. The Court fails to see how such a result—with the same practical effect for Maryland device-owners as the current ATF position—would be inconsistent with the statute. Contrary to Plaintiffs' argument, it is not at all clear from the structure of the exception procedure that SB-707 embodied a clear legislative intent that any existing owner be entitled to continued lawful possession of rapid fire trigger activators in Maryland.

Finally, even assuming, *arguendo*, that there might be an independent ground for objection based on the formal distinction between ATF processing but denying each and every application and ATF refusing to process any applications at all, a suit against the State of Maryland is not the proper vehicle for relief.